1-1-6-3-2-2, 1-1-6-3-2-3, Ferris Morris v. Wayne Carpenter Argument is not to exceed 30 minutes per side. Ms. Carpenter, for appellate. Ms. Smith, I'm sorry, for appellate. May it please the Court, my name is Jennifer Smith with the Tennessee Attorney General's Office representing the Warden Wayne Carpenter in this appeal. Your Honor, I'd like to reserve 7 minutes for rebuttal. Please the Court. Probably the most significant impact of AEDPA was to remove the authority of a federal court to grant habeas relief to state prisoners on claims that the state courts have previously adjudicated and reasonably rejected. This court has recognized this as a jurisdictional limitation on the power of the federal courts. The district court in this case erred when it granted relief on petitioner's claim that he received ineffective assistance of counsel at his capital sentencing hearing. First and foremost, and despite the fact that the state court had already rejected the claim on the merits based on a fully developed record in the state court, the district court conducted a de novo review reaching a different result and completely disregarded the state court's reasoned and reasonable adjudication of the claim. We view this as clearly and plainly contrary to section 2254 D1. Compounding that error, the district court considered, in addition, as part of its de novo analysis, certain affidavits that had been attached to a response in opposition to the warden's motion for summary judgment, attached in order to defeat the warden's request for summary dismissal. These documents had not been admitted in any evidentiary proceeding or subjected to any sort of meaningful scrutiny. This action, in our view, was clearly a violation of Cullen v. Penholster and also violated just the basic rules of evidence because this was not introduced in any evidentiary proceeding and was clearly... Well, when you say it wasn't introduced in any evidentiary proceeding, but wouldn't Cullen say that it couldn't and the district court couldn't and shouldn't have had an evidentiary proceeding? That's exactly right, Your Honor. I mean, the fundamental problem... Is that sort of a double bind? Exactly. Or how do they get new evidence in? Well, they don't. Or are you saying they can't? We're saying they can't in this case, and there never should have been a de novo review in the beginning. And that's what was so really sort of puzzling about the district court's decision in this case because it's clear, if you look at the district court's decision on post-conviction, that the court specifically identified, with respect to the ineffective assistance claim, specifically identified Strickland as the controlling legal standard, clearly articulated in numerous instances the test to evaluate counsel's performance as set forth in that case, and, in fact, in this case, actually more than other cases, went into some detail because there was a challenge in that appeal from the petitioner that the trial court had misapplied the appropriate standard. So the Court of Criminal Appeals, in this case, went even further to explain what that standard was and to articulate it very clearly, not just in passing, as we sometimes see in some cases. So it's clear that the court cited the right standard, applied the right standard, and the district court, in its opinion, even conceded that there was no indication that the court had misapplied the standard. So with that, the analysis, in our view, would have been for the district court to then review and assess the state post-conviction court's analysis as it was made in light of the evidence before it and on grounds of reasonableness, not on correctness. Did the district court make that decision because the state court failed to use that reasonable probability term? Your Honor, it's not clear. And if you look at the court's opinion, it seems to simply reject that. And I'm looking at page 50 of the court's opinion on that. And there's some discussion about whether the proper standard was applied. But the bottom line on the district court's decision was that, given the fact that the Tennessee Court of Criminal Appeals specifically addressed the issue of the burden of proof under Strickland, articulated the correct standard, and stated that Morris had not met that standard, the occasional references to evidence altering the outcome do not conclusively demonstrate that the court applied a standard contrary to Strickland. Then the court goes on to cite cases such as Holland v. Jackson and Woodford v. Biscotti that discuss the fact that simply a shorthand reference to the standard is not sufficient to undermine a finding that the state court applied the proper standard. Yeah, I'm sorry. Counsel, when you said page 50 of which document are you addressing that? Oh, I'm sorry, Your Honor. It's page 50 of the order of the district court granting relief. Oh, of the federal district court. Okay, fine. I'm sorry. I was looking at the Tennessee opinion. Oh, I'm sorry, Your Honor. This was the district court's assessment of the state court's decision. And based upon this, it appears that the district court concluded that the state court in fact applied the correct standard, which in our view would require it to look at the application of that standard for reasonableness. But what the district court appeared to do in this case was to simply discard. In fact, it doesn't even really discuss the analysis at all. It simply says, well, there was a lot of evidence presented in the state court proceedings that would have justified other actions by counsel. And he goes on to recite some of that evidence. Then a few pages later, and I think this is critical to our appeal and the reason I think this appeal is so important, the court, after reciting this evidence, simply says, out of an abundance of caution, the court will engage in a de novo analysis. So there is never a determination below about whether or not the state court's application of Strickland was unreasonable. So which way does the abundance of caution cut? It's something I haven't seen in any opinion before, so I'm not sure exactly. You think it would be the other way. The court might say, you got the law wrong, but out of abundance of caution. We'll also see whether you were unreasonable in applying it. Right. What's the citation for the abundance of caution? Is that also the page 50? Yes, sir, that is page 54 of the same opinion. So just a few pages over, the court says, out of an abundance of caution, and because of the court's concerns that the Tennessee Court of Criminal Appeals application of the Strickland standard and the Sixth Circuit's ruling in Vasquez, the court will review this claim de novo. What do you have to say about Vasquez? Well, I think that the governing authority is what we have, is the standard, and what the court has said is the standard. So I don't think that Vasquez has any bearing. The EDPA sets out the proper mode of analysis, and there's nothing in Vasquez that says that this court can simply disregard that. I mean, in this case, the court properly cited Holland v. Jackson and other cases for the proposition that the shorthand reference to the standard was not fatal to the state court's disposition, and there's nothing in this opinion to suggest that the state court wasn't fully aware of it and didn't. The other side says that doesn't apply in this case exactly. I'm not sure why, but what do you say about the Holland cases, even though it says that it wasn't a shorthand application of it here? Is that what they say? I'm sorry, I misunderstand you. Well, the petitioner says that the Holland case is not applicable here because it wasn't a shorthand reference to it. It's not like that case. Well, I just simply disagree. I mean, there is a full-blown discussion in the state court's opinion on postconviction that discusses the standard in quotes in great detail from Strickland, and the fact that at various points in their opinion later on, they don't specifically recite the words that there is no reasonable probability that the outcome would have been different, that is not fatal to the case because federal courts must presume that the state courts are applying the law that they cite and that they have already correctly articulated. So I think to the extent there's an attempt to make a distinction in Holland, I think there's really no distinction because the rule of Holland is that these courts, federal courts must presume that the state court applied the proper standard, especially as in this case where they clearly cited it. Did the state court make any reference to that language some other place in their opinion? Yes, Your Honor. It's a lengthy opinion, and there are... They cite to Strickland, I know. They use that language. There are citations to Strickland throughout the opinion. There's a lengthy discussion of Strickland in the beginning, addressing the petitioner's first argument about the trial court's improper standard, and at various other places there are references to Strickland, and I don't have the specific page citation in front of me, but there are instances where the court does make a shorthand reference. It says there's no probability. The result would not have been different, language to that effect. But I think simply because later in an extremely lengthy and detailed opinion, the court uses that shorthand language, that's not enough in our view to defeat that decision. And really, the court at that point, and from then on, launches into a purely de novo review of the issue of ineffective assistance. But in our view, if you look at the state court opinion, and you look at the evidence that was before the state court, it was certainly reasonable in reaching the conclusion that it did, which was both that counsel was not deficient in his performance, and actually there were three attorneys working this case, that counsel was not deficient, and that even if there was some deficiency, that the petitioner wasn't prejudiced. The defense theory at trial was actually very logical. There was a very coherent narrative. Essentially, the defense was that the plaintiff, the petitioner, in the years leading up to this crime, had a period of stability, had maintained his employment. There had obviously been some drug abuse earlier, but they focused on this period of stability. This was followed by a rape accusation shortly before this murder happened, which the petitioner had denied, resulting in great strain and stress on his marriage and on his family, which led to his drug use, which caused him to have mood swings and to act strangely, which culminated in the cocaine binge that led to this murder. That was the theory of the defense, and that theory was supported by two experts, and actually was consistent with the petitioner's own statement about what he did that night and why he did it. It was completely consistent. In the face of that, the defense counsel had two mental health experts who had already performed a forensic evaluation shortly after the crime and found no mental disease or defect impacting the petitioner's competence to stand trial or his sanity at the time of the offense. Nevertheless, in spite of the fact that he already had this expert opinion, counsel went on and retained his own expert, Dr. Burnett, who was the head of the psychiatric department at Vanderbilt Medical Center, who found no evidence of mental disease or defect and testified about the petitioner's mental state at the time of the crime as impacted by his cocaine use, which was the theory of the defense. Well, the petitioner says that he didn't have enough background information or he would have found that he had mental disease. Well, I'm not sure that background information would have made a difference. This was a... he had exactly what he asked for. He didn't ask for any additional information. He seemed to be secure in his diagnosis. He made clear in his testimony that he had obtained a medical history from the petitioner, that he had spent some time with him. He is a medical doctor. If he needed some additional information to make a medical diagnosis, he certainly could have asked for it. And I think that defense counsel is certainly reasonable in relying on the fact that his diagnosis was what it was and that he didn't need additional information to make any further diagnosis. One of the things that the district court seems to make much of is the fact that the mitigation specialist, Gloria Shettles, had suspected that the petitioner was bipolar based upon her interactions with him and sort of how he behaved. Well, Dr. Burnett spent time with the petitioner as well. He as well observed how he behaved, and he was a medical doctor and certainly was capable of making an assessment and an evaluation or a diagnosis if it was warranted. Are you referring to the Shettles' statement as being sort of lay testimony as opposed to what Burnett could have done as a medical doctor? Is that the distinction you're making? Well, I think certainly a diagnosis of bipolar is a medical diagnosis. Gloria Shettles has a background in, as I understand her background, has some training or even a higher degree in psychology. And so she had expressed, at least in her testimony, she indicated that she had some concerns that the petitioner was bipolar based on his moods, based on his manner, based on some things that she had uncovered. But at the same time, When you say uncovered, is that in terms of records or testimony? Well, in terms of doing interviews, Gloria Shettles interviewed a number of family members. And were those interviews or write-ups available to Burnett? I don't. His testimony doesn't reflect that he was given those write-ups. So it's not clear that he was given the write-ups. It's also not clear whether he requested any additional background. Counsel had the write-ups or the transcripts? Certainly so. Certainly so because the mitigation case that Gloria Shettles developed was presented at the sentencing hearing. And that's another point about the district court that I just will mention briefly. There was a suggestion toward the end of its ruling on the ineffective assistance at sentencing that somehow counsel did nothing in mitigation, that counsel didn't ask for mercy, that counsel didn't put on proof. That is simply not supported by the record. Counsel absolutely put on proof. Dr. Burnett's testimony specifically went to at least two aggravating circumstances, which he was specifically asked about. And I think what's important about that when you're looking at what counsel did and assessing it, certainly in hindsight, the petitioner was actually facing a death penalty for two separate murders. In two separate murders, the jury returned two aggravating circumstances. One of the circumstances overlapped, and then there were two different ones for the other two. The jury actually returned a sentence of life without parole for the murder of Charles Ragland and returned a sentence of death for the murder of Erica Hurd. So it's clear that even though the jury found two aggravating circumstances as to each murder, there was some consideration about the impact of the mitigation. There was a mitigation case presented. So this is not a case where there was nothing in mitigation. Could you comment as to why the mitigation succeeded on one and not on the other, in the sense that background kind of information you would think would be the same as to both, either horrible childhood or I'm really a good guy? You wouldn't think that would make any difference between the two. Was it just that the multiple stabbing was more horrible than? I suspect that it's because the medical examiner's testimony was that Mr. Ragland's death was instantaneous and that Ms. Hurd sustained 37 stab wounds, many of them. With regard to the mitigation, would it be fair to say that usually, frankly, in mitigation, there are many ways to go about it, but two of the most common are I had a horrible childhood, everything affected me, so I'm not as responsible, or I'm really a pretty good guy. I've kept a job, I did all of this, and this was out of character. And in this case, they went with the second argument rather than the first. That's true. In this case, they did go with the second and perhaps had some success, at least partial, with regard to the first murder. Is there a way to put both of them in at the same time? Well, that was something that came up at the post-conviction, and that was a concern of defense counsel, that this was a double-edged sword. When you start opening the door to all of these additional diagnoses, then you're going to get, you're going to bring out some aspects of the petitioner's background that counsel wasn't sure that they wanted the jury to hear about. And there was a lot of instances of drug use in the past. They really wanted to focus on the seven- or eight-year period of stability in his job. They brought his employer in. I mean, the facts of this crime, frankly, were horrific. And the notion that the petitioner was somehow going to be acquitted of murder under these circumstances where he himself admitted to planning to kill, intending to kill Charles Ragland, laying in wait for him, at each instance, his own words put him fully culpable for the murder. So, you know, as Your Honor said, there's a couple of ways to go about it. In this instance, what the defense tried to do was to present him as someone who would do well in prison, who had helped prisoners, who had done well in schools, in certain classes, and who would be a good prisoner and basically should just be put away for life rather than be executed. Dr. Burnett just testified in the guilt phase, didn't he? And then they just used it for the mitigation. That is true. But if you look at his testimony, there are specific questions toward the end of his testimony. For example, defense counsel asked, at the time of the murder, is it your opinion that the petitioner was under extreme mental and emotional disturbance? And he answered yes to that. That is a specific mitigating circumstance. So it's clear that he lacked specific intent. So he testified to things in the guilt phase that would have been applicable in the sentencing phase, and the jury was specifically instructed that at the beginning or at the conclusion of the sentencing phase that it could consider the evidence submitted throughout the trial. So it's not unusual for defense counsel to rely on evidence presented during the guilt phase. In fact, in the first Cone v. Beryl appeal, that's precisely what defense counsel did, and the Supreme Court upheld that. Just to ask you one thing about the opinion of the Tennessee Court of Criminal Appeals. When that court adjudicated the guilt phase ineffective assistance of counsel claim or claims, I should say, what is your position as to whether the Tennessee Court of Criminal Appeals adjudicated those claims on the merits? I certainly think that the claim was adjudicated on the merits, and the claim that was presented, as I understand it, was with regard to the guilt phase. Was that counsel was deficient for failing to uncover evidence of mental disorders like bipolar disorder or other disorders that would have, in combination with the cocaine use at the time of the offense, impacted his ability to form the requisite mens rea. And that was specifically addressed by the Tennessee Court of Criminal Appeals in their opinion. And the focus was primarily on this bipolar disorder, and the court made much of that, but looked overall at all of the proof that was presented. And I think what you have is, and I do want to point out one thing in the opinion of the district court, which I think is really telling, and it's on page 56. You've answered that question. Your time's up unless you want to use your rebuttal. Did that answer your question well enough? I'll save it for rebuttal. Okay. You'll have your full seven minutes for rebuttal or for presentation of your cross-appeal. I guess that's as high as it goes. Good afternoon. My name is Jerome Del Pino. I, along with co-counsel, represent Ferris-Morris, the petitioner appellee in this matter. This afternoon I'd like to discuss the points that this appeal raises, which the court has already discussed with counsel for the state, and then at the close I'll turn my attention to issues presented by our motion to remand,  I would begin by disputing opposing counsel's submission that the decision in Vasquez v. Bradshaw really has no bearing on this. If you look at the district court's opinion, it quoted at length from Vasquez v. Bradshaw because that is a decision from this court that directly addressed a similar decision from an Ohio state court, where rather than applying the strict and reasonable probability standard, the collateral review court applied a would-have-changed-the-outcome standard of prejudice. And this court was very clear that that is not casual error and cannot be dismissed as the words of the court were mere anodyne shorthand. It is a different standard because it places a greater burden on a petitioner, requiring them to prove with certainty that the outcome of their trial would have been an acquittal versus a reasonable probability that's required by Strickland. And I think that what is really most critical for the court to direct its attention to in regards to the guiding case law is the Supreme Court's language in Williams v. Taylor that a state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. The state's brief points to the certain number of times that the Tennessee court recited the Strickland standard. But what is dispositive in a 2254D analysis is what standard the state court actually applied. And in each instance where the Tennessee Court of Criminal Appeals looked at the question of prejudice, they found that Mr. Morris had not shown prejudice because he had not proved with certainty a different outcome. In regards to his military records, they were not mitigating evidence that would have resulted in a different sentencing decision. Page 47. Did they use the words with certainty? Well, no, sir. No, Your Honor, they did not. But that is the effect. You were using that word because the question I have for you, of course, I wrote Vasquez, but I also wrote Sutton v. Bell. And in footnote three of Sutton, we seem to address almost exactly the issue we have before us here where some of the time the court used the words reasonable probability and some of the time it used words like did not find the comment affected the verdict. And there we look to Woodford v. Visciati and said we give the state courts the benefit of the doubt if there's some unclarity. How does Sutton not cover this case? Well, I think to the extent that Sutton is guided by Woodford and Holland v. Jackson is in the same pool with Woodford, in those cases the Supreme Court upheld the state court decision, finding that the state court had continued to address the question of prejudice on a measure of probability. That is, I believe it was both in Holland and Woodford where the state court dropped the modifier reasonable and looked for the probability of a different outcome and the Supreme Court acknowledged that it had engaged in that shorthand itself in certain of its decisions. Rather than requiring a heightened standard of prejudice, which is proof of a different outcome, proof that the result would have been different, proof that there would have been a sentence less than death. So I think Holland and Woodford addressed that distinction as to instances wherein a state court certainly is due some amount of deference and the benefit of the doubt, but in instances where the analysis of the state court shows that it was looking for proof of prejudice by a standard higher than that required by Strickland, acknowledged by Williams v. Taylor, that's contrary to for purposes of 2254D. So do you think we got it wrong in Sutton? Are you saying that we weren't following those two cases? That you weren't following? You sort of went from, I mean, I raised Sutton, you sort of said, well, let's talk about Woodford and Holland, and I wasn't sure if you were saying that Sutton wasn't a proper application of Woodford and Holland. My recollection, Your Honor, is that in Sutton, when it came to the question of application, that is the court's analysis of the state or the court's review of the state court's analysis or application of the law of Strickland to the facts of the case, that they did use the reasonable probability language and the shorthand language was interspersed at other junctures throughout the decision, but that their application of law to facts adhered to Strickland. Okay, we can look at it. I'm not sure I agree with that, but we can reread it. Go ahead. So in light of that, and the district courts do consideration for this court's guidance in Vasquez, the Tennessee Court of Criminal Appeals opinion was contrary to the clearly established federal law of Strickland. In regards to trial counsel's performance, the prevailing norms recognized, professional norms recognized by the Supreme Court, recognized by this court, and recognized by the Tennessee Supreme Court, as far back as I believe it was 1976 in Baxter v. Rose, required trial counsel to do greater investigation than they did here in this case. What is critical for this court's consideration is that trial counsel had no less than eight indications that Mr. Morris might be mentally ill, specifically struggling with some sort of bipolar illness which produced symptoms of hypomania. But they had the head of the psychiatric department from Vanderbilt who consulted with him and examined him, right? Dr. Burnett at that time was the head of the psychiatric department. Probably couldn't have gotten anybody better in Tennessee, right? I'm not familiar with the psychiatric community in Tennessee in 1996 when this trial took place. But in regards to Dr. Burnett's assessment, a few things are critical to note. All that they gave to Dr. Burnett were the police files. They gave him the indictment, they gave him the police statement, and they did give him the pretrial court-ordered assessment, which trial counsel acknowledged in post-conviction was shallow and an inappropriate basis from which to develop a defense or from which to develop issues for mitigation. Secondly, they gave him a textbook chapter on the effects of cocaine, directing him that that's where they had decided at that point to take their defense in the direction of cocaine intoxication. That sounds like a pretty good theory, right? If it was the whole truth, indeed. But when you've ignored signs of bipolar illness and when you have ignored signs of clinically significant paranoia and when you have failed to follow up on your client's own report that he suffered major head trauma in his history and you don't do any testing which might reveal cognitive deficits, specifically damage to the frontal lobe, it's a deficient performance. Did Dr. Burnett say he needed more time to examine him or need something else or a CAT scan or anything like this? Dr. Burnett did not say any such thing to defense counsel. However, Dr. Burnett faxed his intended testimony outline to trial counsel on the first day of trial. Dr. Burnett never met or spoke with the mitigation specialist. Dr. Burnett actually speculated, based on his own 90 minutes with Mr. Morris, that he might be bipolar. So Burnett did actually see and talk to him then, right? Dr. Burnett met with Mr. Morris, I believe, for about 90 minutes, yes, sir. But trial counsel directed Dr. Burnett to cocaine intoxication. That was where they staked out their ground. Your argument on the prejudice side in the sense that, speaking in lay terms, the defense seemed to be that this type of extreme behavior was out of character and was driven by the cocaine psychosis or intoxication, whatever lay word you would use, bringing in the other mental issues, assuming that there were such, would seem to have driven in exactly the same direction, that this was because you normally, the rest of the defense was not trying to say that he was messed up before he went back to using the cocaine. Doesn't it sort of give you the same problem as of, are you trying to say that he was always a bad guy and that's what caused his problems or that he was a good guy and the cocaine caused his problems? Why would the other have been any better or less prejudicial? I disagree with the notion that proof of mental illness makes someone a bad guy. That's how the state portrays the alternative, that they could have either presented him as a stable worker who had a bad night on a crack binge and turned into this, or I think they used the word something like a terminally ill assailant or something like that. I wouldn't go that far. Those are the state words. The question is more how would you have tried, how would you have had the state, the defense, try to make this bipolarness either mitigating at the sentencing or so overwhelming as to prevent mens rea at the guilt stage. Those are the two things that you'd like to do. How would you have had them do that? I think all of the post-conviction experts' testimony, including the state's expert, answers that question, and that is cocaine intoxication on a normal, healthy brain is one thing. Mr. Morris does not have a normal, healthy brain. Days, hours, weeks, months before he began smoking crack on that afternoon, he was bipolar. He had clinically significant paranoia. He had cognitive deficits, probably as a result of his head injuries through the course of his life, and each one of those compounded one another exponentially with the addition of the cocaine. It wasn't zero plus one. It was minus five minus one for Mr. Morris. And to present a jury with somebody who is under situational anxiety because of a rape allegation and goes out and decides to go on a crack binge is an entirely different picture than somebody who has been mentally ill for the better part of their life, is a product of a household with mental illness in regards to the evidence of his mother having the same symptoms. And the interplay of both the cocaine and, as Dr. Walker pointed out in post-conviction, the alcohol that Mr. Morris consumed that night cannot be overlooked because cocaine and alcohol essentially have an exponentially compounding effect in and of themselves, never mind, if you add to it, the debilitated brain chemistry of... Was the alcohol not presented to the jury? I believe that there might have been testimony from Mr. Morris's brother that he had a drink. But the fact, the pharmacological... Sorry, the neuro, and it's a critical distinction, the neuropharmacological difference or specifics of cocaine with alcohol certainly was not presented. In fact, the neuropharmacological significance of cocaine by itself was not presented. Dr. Parker, the defense's other expert, was a pharmacologist. He talked about it, didn't he? He talked about cocaine's effects on the body. And if you look, Judge Seiler... It couldn't have the antenna required, the mens rea, right? He was specifically and explicitly excluded from giving any testimony as to Ferris Morris's state of mind. The state saw to that and the voir dire to qualify him as an expert. And if you look at one point in the judge's consideration of the issue, this is the trial judge at trial, when the defense is endeavoring to qualify Dr. Parker as an expert, the trial court makes clear that he can testify as to these effects that cocaine might have had to make him paranoid, but that doesn't mean he's a paranoid individual. Otherwise, he's normal, except for the effects of the cocaine. And therein lies the falsehood and the failure of trial counsel. Mr. Morris was not otherwise normal. He was severely mentally ill. And every single expert who had the available evidence has found that, including the state's expert in postconviction, Dr. Walker. But Dr. Burnett didn't say he was normal, did he? Dr. Burnett said that his behavior was very strange and it was probably a consequence of the cocaine, which is one-sixth of the whole picture. And he might have been bipolar. No, Dr. Burnett speculated in his own notes that Mr. Morris was bipolar. He never raised that issue to the jury. The defense counsel had that. No, sir, defense counsel did not have those notes. Defense counsel had a typed outline of his intended trial testimony that they received on the morning the trial began. They didn't ask him that question, I guess. They did not. They did not make any development of that issue with Dr. Burnett. Defense counsel failed to do so. Did the police report say anything about alcohol being ingested by the defendant? No, sir, it is my recollection that it did not. So then looking at that web of impairments into which the cocaine and alcohol was infused, there is clearly a reasonable probability that one juror, this court's decision in Harries v. Bell makes an excellent analysis of the Tennessee capital sentencing procedure and noting in detail that only one juror need vote for a sentence less than death. With that web of impairments having infused into it cocaine and alcohol and the understanding that Mr. Morris' mental illness had existed for almost his whole life, it was something that he had inherited from his mother, that creates a reasonable probability that at least one juror would have voted for a sentence less than death. Counsel, let me ask you this. Obviously when we do these cases and we're trying in hindsight to figure out what would have happened if something had been done different on prejudice, I want to take you back to Sutton if you feel able to make any comparison because that's a Tennessee case. Judge Daughtry's concurrence there talks about some of the evidentiary issues if you go a different way. It talks about bad background and evil effects and the majority there came out upholding that there was no ineffectiveness. Can I just ask you to clarify bad background? Well, in the sense of a bad childhood, abused by parents, head injuries, it's not exactly identical, but if you want to say a lot of bad stuff happened to him that caused his head to be messed up. But just in a general way, if we're talking about how reasonable would it have been under the circumstances of a crime with mitigation and we held that it wouldn't, that the state court was correct, that there wasn't a reasonable probability, am I just wrong in looking at that for some guidance as well or do you have a way of saying that your man's case is stronger than Sutton's was? My recollection of the details of Sutton, including the court's analysis of the contrary to matter, is not expansive or clear. That's fair. But I would submit that just about all of the decisions of this court may be looked to for guidance in deciding the matter before the court today. I just wanted to give you a shot at it if you had a thought. Okay, go on. If I could point to a couple of other cases, one for distinction, Clark v. Mitchell, where the court denied relief, in part based on the fact that the post-conviction testimony or the collateral review testimony was very similar to what was shown at trial and the expert in that case said that the condition with which, this is the collateral review expert in state court, the condition with which he ultimately diagnosed the petitioner was very, very subtle and no lay person could have detected it and even an expert would not have detected it without extensive neurological testing. That's wholly different than Mr. Morris' case here where all of the experts agree. When you talk about collateral evidence in Clark, is that at the federal level or at the state post-conviction? That's at the state post-conviction level, Your Honor. Okay. And what's the analogy here? I thought most of your evidence had been brought up at the federal level. Am I wrong about that? No, sir. That is not the case. We rely extensively on the state court record where all of the experts, Dr. Smith, Woods, You have two under Cullen against Penholster anyway, don't you? Cullen versus Penholster says that, yes, the 2254D analysis by a federal court exercising habeas jurisdiction is limited to the state court record. So we should focus on that, but do you think you had enough at that point? If you look at footnote 24, Judge Breen cites Cullen versus Penholster and that restriction upon his review and abides by that up until the finding that the Tennessee court decision was contrary to Strickland under this court's decision in Vasquez. But you would argue that even if we disagreed with that, you had enough at the state post-conviction level? Or are you required to win on that point? On the contrary to? Right. Well, in order to get enough evidence of the strength of your case as to the mental infirmities and so on? I believe that the post-conviction record can stand on its own. But I will say that the evidence that we have introduced in the federal proceeding is entirely in agreement with and fully supports all of the expert evidence from the state court post-conviction proceeding. Drs. Walker, Woods, and Smith in the state court agreed that Mr. Morris was bipolar. Drs. Smith and Woods found that he suffered a cocaine-induced psychosis. Dr. Silva, whose report was introduced in the district court, found that Mr. Morris suffered a cocaine-induced psychosis with delirium and he was in fact bipolar. Dr. Auble's evidence from the state court showed significant cognitive deficits based on her neurological testing. Dr. Gerr's report merely looks at MRIs, pictures of Mr. Morris's brain, that in fact confirms damage to the very areas that Dr. Auble's testing pointed to. Dr. Lundberg-Love, whose report was submitted in federal court, merely explains the specifics of the neurotoxicology of cocaine, alcohol, and bipolar illness. I don't fully understand what... Dr. Walker said in state court. I'm sorry? I don't fully understand what value this evidence was that came before the district court. if a full evidentiary hearing was held in the state court. I thought that's what Cullen v. Penholster says. Cullen v. Penholster says that the 2254-D analysis has to be made on the state court record, which Judge Breen did. Judge Breen then found that... I even consider the federal evidence. In de novo review, once Judge Breen found that the state court decision was contrary to Strickland, then that cleared the way for de novo review of the claim before the federal court. It does not violate... As a matter of fact, it is in line with this court's decision last year in Harris v. Haberlin, where after this court found that there had been a decision by the state court on a Batson claim that was contrary to Batson, that the district court then could take additional evidence in support of the claim. Thank you. Did you want to talk about your remand at all? I mean, your time is your own. I don't know how much you have left, but you mentioned that earlier. Yes, Your Honor, I did. There are just a couple of points very quickly from the state's argument that I would like to address. One is this repeated notion in their briefs that trial counsel hired three mental health experts. That's just not borne out by the facts. They hired only one. They argue that bipolar was not established in the post-conviction proceeding because Mr. Morris' experts disagreed, specifically Dr. Abel versus Dr. Smith and Woods. Dr. Abel did neurological testing. She didn't do a psychiatric assessment. She did say that the cognitive deficits that she found in Mr. Morris were frequently found among people with bipolar disorder. There was no disagreement. And lastly, a couple of points regarding the Tennessee court's decision. The Tennessee court found that the post-conviction evidence was not significantly different than the trial evidence. In reality, they were worlds apart. That's just an unreasonable finding. The Tennessee court found that counsel rightly relied on the pretrial assessments. After counsel testified themselves that the pretrial assessments were not a basis for developing defense or mitigation evidence, it's an unreasonable finding. The Tennessee court dismissed the social history evidence because it would have put Mr. Morris' history of drug use in front of the jury. That is also unreasonable when the entire defense that was presented was based on Mr. Morris' drug use. At that point, the cow was out of the barn, so to speak. Is it drug use or past drug transactional history? I mean, way beyond this particular instance. Obviously, everybody knew about the cocaine on the night in question or the day and night, but I thought the question was his past history of both use and trafficking. The Tennessee court addresses his history of drug use, which when your defense is that you've bought and smoked $400 worth of crack cocaine, I submit his drug use is already out there. In regards to our remand motion, I have one minute left. This is evidence that came to light just within the last 30 days. Dr. Walker testified in post-conviction that Mr. Morris did not suffer a cocaine-induced psychosis. It's the only point on which he differed with Drs. Woods and Smith. And that's critical because the fact of psychosis is when the person actually becomes removed from and detached from reality, and it has far greater significance for determining their mental capacity than does mere intoxication. The fact under this court's own decisions that acknowledge that cocaine use raises questions as to a person's credibility, to the extent that any court would rely on Dr. Walker's testimony in making their decision on Mr. Morris' ineffectiveness claims, the fact of his admitted cocaine addiction and binge use must be taken into consideration. That hasn't been considered by any court. For that reason, we urge the remand to the district court to sort out whether there's opportunity for Mr. Morris to present that in state court or whether that may be considered by the district court under the current status of the law. I see I'm out of time. I'll return on counsel. Just a couple of points. If the district court found in its opinion that the Tennessee Court of Criminal Appeals decision was contrary to Strickland, it did so silently. I cannot find anywhere in the opinion where it says that. Nor does the district court explicitly say that the state court opinion was an unreasonable application of Strickland based upon the facts before it. The court immediately goes instead into a de novo review. With respect to counsel's argument that the state court's conclusion that the evidence presented during the post-conviction proceeding was not significantly different from what was presented at trial, I would disagree with that as well and point directly to the district court's own de novo finding in this case where the court said, and this is the district court looking at it de novo, says the information produced indicates that there were varying opinions related to Morris' psychiatric condition at the time of the murders, although the experts generally agreed that his substance abuse affected his decision making. That is the bottom line, and I appreciated Mr. Del Pino's recitation of each of the opinions of the experts because what that showed was that, yes, there are some differing opinions about some underlying psychiatric or psychological issues, but it all points directly to the use of cocaine and how it impacted the petitioner's actions and decision making in this circumstance. And that is precisely what the theory of the defense was, and that's precisely what the evidence presented to the jury was. Dr. Burnett specifically testified that he did not think that it was possible that petitioner did not have the ability, based on his view of his cocaine use and cocaine intoxication, to form the requisite mens re for first-degree murder. Sorry, I thought I heard a double negative in there. Were you saying that Burnett told the jury that he could not form the intent? He said that he may not have been able to form the intent. May not have been able to. He did not commit to he could not. Kind of a conditional, or less than 50 percent. Well, he's suggesting that it's possible. He's putting it out there. And did Walker testify exactly to the contrary? No, he did testify to that as well. I don't want to misspeak, so let me look at my notes. Your adversary seemed to say that Walker testified that there was no psychosis from the cocaine. Dr. Walker testified that he did not think that he was under a psychosis at the time. He didn't speak directly, as I recall, to the mens re, but he did specifically say that he doubted that the offense would have happened without the cocaine. He specifically pointed to the cocaine as the source of the offense. The other thing that's common. Is that quite different from not having the mens rea? In other words, it sounds more like it's a but-for cause. I don't think Dr. Walker came out and negated the mens rea, for sure. But I do think the commonality in every single expert was the impact on judgment, decision-making, the fact that the defendant was in a manic state during portions of the offense, the fact that he exercised a very poor judgment. He was paranoid. He was confused. He was agitated. That is a common theme throughout, and every single one points to the fact that he was under the influence of cocaine during the course of the offense. So that's the common theme. It's a common theme that the district court as well pointed out. I would also point out, too, and I certainly appreciate the fact that mental illness, we see in many opinions that mental illness is listed as a mitigating factor. But mental illness is only mitigating to the extent that it impacts an individual's culpability and impacts the activity at the time of the crime. Otherwise, it's just another fact about the petitioner for the jury to take into consideration. Well, when you say that, are you focusing on the guilt phase as opposed to the sentencing? No, Your Honor. I'm actually focusing on the sentencing phase here. I'm talking about the reduction of culpability for the purpose of a sentence of life as opposed to a sentence of death. The jury can take any of that into account. That's true. We may sit back and think that it's sensible or not sensible, but that's one of the tough things about this area is that ex-ante, you're never sure which one's going to work, and ex-post, you're never sure which one would have worked. I totally agree. And those are the kinds of judgments and decisions that trial counsel make every day. And this counsel made that decision. He retained a mental expert. I confess that Mr. Del Pino is correct, that our brief is inaccurate in stating that we, that the state defendant or the trial counsel retained three mental health experts. He had the benefit of the pretrial evaluation. He retained Dr. Burnett, and he retained Dr. Parker, I believe is his name, the pharmacologist, who, while not a mental health expert, certainly testified about the effects of cocaine and intoxication on one's behavior and specifically focused on the types of behaviors that occurred in this crime. So while his testimony was limited, I think trial counsel certainly made the best of his testimony at the time. Did the expert who examined the defendant before trial ever say he had a mental illness at all? Not the forensic competency evaluation, no, Your Honor. And those are fairly cursory evaluations. But he still didn't say there was any sign of a neurosis or psychosis or anything like that? To my knowledge, that's correct, Your Honor. Which person was it that did that pretrial competency? There were two. There was a psychologist, Dr. Drury, Dr. Richard Drury, and a psychiatrist, Dr. Rick Pullen. They, as I understand it, they evaluated him. They both evaluated him, but then presented a joint report concluding that there was no evidence of mental disease. Both sides have access to that report? That was a court-ordered evaluation, yes, Your Honor, on competence and sanity. I think, really, the district court's own observation points out that, really, despite the varying opinions about differing diagnoses, and there were several diagnoses, bipolar was common with some of the experts and other experts didn't go that far, but all of them pointed to the intoxication at the time of the offense. Do you want to say anything about the remand motion? I do. You don't have to. Just briefly, and I won't say anything else, I mean, I think our position on that is pretty clear in our response. This was a witness that testified on post-conviction. There was an opportunity to cross-examine him. There really is no mechanism, in our view, to reopen that proof just because evidence has come to light that the petitioner thinks may be used to impeach him 10 years after the fact, which is when this testimony happened 10 years ago. And the fact of the matter is that Dr. Walker's testimony wasn't terribly adverse to the petitioner at the post-conviction. His testimony was very consistent with the other experts, with the exception of his disagreement that he was under a psychosis at the time of the offense. Did he testify only at the post-conviction? He did. Not before the jury? No, sir. And as I understand it, based on the transcript that's been lodged with the district court, a lot of this information came out around the 2010 time frame in any event, because I think it's when it came to light, maybe during some sort of divorce proceeding. But in any event, it was something that there's just no way at this point to go back and reopen that post-conviction proceeding. One other thing I would just point out on the trial court, the state court's application of the appropriate Strickland standard, to be clear, despite any disagreement about whether or not the court used all the right words when they were reciting the prejudice prong, the court very clearly found that trial counsel was not deficient in his performance with respect to both the performance at guilt phase and at sentencing phase. And on that basis alone, the state court's decision could stand. With respect to the guilt phase, in our view, the defendant's own words really put that issue to rest. The defendant admitted that he intended to kill Charles Raglin. He laid in wait and did it. He admitted that the reason he raped Angela Raglin was because he had been falsely accused of raping and was going to get something out of it this time. He admitted that he killed Erica Hurd because she stopped cooperating. His own words established mens rea. If there are no further questions, we ask that the court reverse the judgment of the district court. Thank you, counsel. Your time's expired. Is there any other time reserved? How much time was resided in here, or anything? Two minutes. Two minutes? All right, thank you. Thank you, Your Honor. This is only on the cross appeal. Yes, and I believe the remand relates to the cross appeal, and so I would simply say that pursuant to Federal Rule of Appellate Procedure 27A4, we intend to file a reply to the state's response by this Friday within the seven days permitted by the rule. Because it impacts both guilt and penalty phase determination, I'm sorry, if I may, I would direct the court to Gonzales v. Wong, 667 F. 3rd, 965, and this court's own decision in Eakes v. Sexton from just last year, 2014, a Westlaw case, 665-7037, which addressed the propriety of a remand to the district court when new facts have come to light following the closure of state collateral review proceedings that affect the reliability of those proceedings and an analysis of that under pinholster. The state contended that Mr. Morris's mental illness has no mitigating effect unless it relates specifically to the crime. Under the Supreme Court's decision in Skipper, that's just not the case. I would direct the court as well in regards to the district court's analysis of the matter to page 61 of the district court's opinion that a review of the record indicates that there was a substantial information that should have caused counsel to further investigate whether Mr. Morris had a mental illness separate from the effects of cocaine intoxication and how his alcohol and cocaine use would have affected his cognitive abilities on the night of the murder. That's our argument before this court. We don't dispute that he was intoxicated under cocaine. The question is whether that's all there was, and all of the expert evidence agrees that it was five things more than that, each of which acted exponentially upon the other. We would urge... Time's up, but a question with respect to the remand motion and Walker's past history. Is there any kind of statement about the time at which he testified, or is it simply that he used cocaine frequently over a period of time that included his testimony? His testimony at the end of January of this year was that he was addicted from 1999 to 2012 and engaged in binge use of cocaine, which time encompasses both his meeting with and assessment of Mr. Morris and his testimony in the post-conviction proceeding. But the binge use is not tied to a particular time of either his testifying or his meeting. He did not explicate dates of his binges in his January 2015 testimony. Presumably he wasn't binging every single day. I gather... I don't know. That's part of the reason that we need to go back and figure that out. We urge that the district court's decision be affirmed. Thank you. Counsel, case will be submitted and the clerk may adjourn.